## John Holliday and Sarah Lounsberry, Defendants in Error, v. O'Gara Coal Company, Plaintiff in Error.

1. MINES AND MINERALS, § 182*—*when existence of dangerous condition in mine because of fallen electric wires is question for jury.* Where electric wires carrying current for motors and machines in a coal mine were fastened to pegs at the top of a narrow space eighteen inches wide and four feet high on the side of a car track but had become detached and had fallen to the ground a few inches from the outside rail for about thirty feet so that plaintiffs' son, a car driver, when he went to the rear of his car by direction of the mine boss to remove a sprag placed under the inside wheel to keep the car from backing came in contact with said fallen wires and was killed, *held* that whether a dangerous condition existed was a question of fact for the jury.

2. MINES AND MINERALS, §. 194*—*when instruction is properly refused in action for death of miner.* An instruction in an action for the death of a miner which does not include all the elements to be considered in determining whether he was properly at the place in the mine where he was killed is properly refused.

3. DEATH, § 62*—*when presumed that pecuniary loss arises from death of child.* The law presumes pecuniary loss to a parent from the fact of his child's death, but a collateral relative must prove the deceased was in the habit of furnishing such relative pecuniary assistance or he can only recover nominal damages.

4. APPEAL AND ERROR, § 1535*—*when omission of word "preponderance" from instruction is harmless error.* The omission of the word "preponderance" from an instruction requiring the jury to find "from the evidence" is not reversible error where the instructions taken as a series showed the jury were fully informed on the questions of burden of proof and preponderance of evidence and could not have been misled.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

5. DEATH, § 67*—*when verdict is not excessive for death of child.* Where, in an action for damages for killing of plaintiffs' son, the deceased was shown to have been earning $2.56 a day and was only eighteen years old, a verdict for $1,000 was not unreasonable.

Error to the Circuit Court of Saline county; the Hon. ALBERT W. LEWIS, Judge, presiding. Heard in this court at the March term, 1916. Affirmed. Opinion filed November 13, 1916.

WHITLEY & COMBE, for plaintiff in error; MASTIN & SHERLOCK, of counsel.

GEORGE W. DOWELL and B. W. POPE, for defendants in error; PARRISH, PARRISH & STILWELL, of counsel.

MR. JUSTICE McBRIDE delivered the opinion of the court.

Defendant in error recovered a judgment in the court below for $1,000, to reverse which this writ of error is prosecuted.

It appears from the record in this case that Carl Holliday, a son of the defendant in error, hereinafter called defendants, was killed while engaged at work in the mine of plaintiff in error, hereinafter called plaintiff. The deceased was killed on March 1, 1910, by reason of having come in contact with an uninsulated electric wire that was used for carrying the current of electricity to the machines that were engaged in under-cutting the coal. Deceased had been at work for plaintiff for about two weeks and was engaged as a driver, pulling coal from the rooms into what they call a parting, on the west side of the mine, and was located in the main west entry. This parting was from seventy-five to one hundred feet in length and was of the width of about thirty feet, and in it was constructed two switches, one on the north side of the parting and one on the south side thereof; both of which switches connected with a single track in the main entry leading out

into the works on the west and to the single track extending from the east end of the parting to the hoisting shaft. The empty cars were brought from the hoisting shaft with a motor and placed upon the north switch in this parting and were there taken by the drivers west into the several rooms, and when loaded they were returned by the drivers and collected upon the track located upon the south side of the parting, from whence they were hauled by the motor into the hoisting shaft. There was a down grade from the west to this parting and drivers in bringing in their coal were required to sprag their cars so as to keep them from running through the switch in the parting onto the main track. At the place where the spragging was done there was only a single track, and the driver could sprag either on the north side of his car or on the south side, but according to the testimony of the witness, Florence Rippy, who was boss driver, he had told the deceased: "I would sprag on the south side in order to get over this switch on the branch, and for him to be careful and not get hurt;" and the deceased was at the time working under the directions of Rippy. It further appears that the track on the south side was within about eighteen inches of the rib, opposite the rails, which had been cut up the distance of about four feet, which left an opening about eighteen inches wide and four feet high on the south side of the rail, and in this open place the electric wires were placed which carried the electric current for the motors, and also for the machines, and these wires had been fastened to the top of this open space by pegs that were insulated; that for some twenty-five or thirty feet the wires had in some manner become detached from the pegs and dropped down to the ground, which left the wires within a very few inches of the outside rail of the south switch, and when deceased ran his car of coal in on this switch it came opposite the place where the wires were down, and the sprag being in the south

wheel, he passed around behind the car and attempted to remove the sprag which placed him close to the wire carrying the current of electricity to the machines, and it was at this place and under these conditions that he was killed by this electric current.

It further appears from the record that the defendants were the father and mother of deceased, and that when he was about the age of seven or eight years they separated and afterwards the mother procured a divorce and the boy remained with her for a while and the mother was remarried, at which time the boy lived with his grandfather, and in later years worked with his father in the mine, and the father received the wages. It also appears that immediately prior to the time of the boy's death he had been receiving his own wages and had, in fact, assigned them to different persons to procure money and articles purchased in the store. He was receiving $2.56 per day for his work.

It is insisted by counsel for plaintiff that the dangerous condition did not exist in the mine as charged in the declaration and for that reason there could be no recovery.

The evidence discloses that in this parting there were two tracks, one on the south side upon which the loaded cars were brought from the works and collected for the motor to haul to the hoisting shaft, and the track upon the north where the empty cars were collected for the drivers to haul out into the works. There was a space of about eighteen inches wide and four feet high between the south rail and the rib, in which the wires for carrying the electricity were located. They had been fastened to the top of this under cut but by some means the wire had become detached from the fastening for the distance of twenty-five or thirty feet and allowed to lie on or near the ground. There was a down grade from the west and the drivers were required to sprag their cars so as to keep them from running through the switch onto the track, and

the deceased had been instructed by the boss driver, under whose direction he was working, that it was better to sprag the south wheel of his car so that when the car reached the frog it would turn onto the proper switch, and this the deceased did, and when the car was stopped near the place where this wire was down, other cars being ahead of it, there was no occasion to leave the sprag in so he passed around behind the car and stooped in between the car and the wire to remove the sprag, and while doing so was killed. We think that the evidence tended to show that a dangerous condition did exist and it was certainly a question of fact for the jury to determine, and the jury having found that it was a dangerous condition, we can see no reason for disturbing the verdict upon that ground, and believe that the court did not err in refusing to direct a verdict for the defendant. In this connection complaint is made of the refusal of defendant's sixth instruction, which, in effect, states such physical facts would not necessarily constitute a dangerous condition, but did not include in this statement the necessity of spragging the car or the removal of the sprag, and other conditions that in fact existed, and concluded by saying that if deceased did not have to go in the place where he did in the discharge of his duty, that the jury should find the defendant not guilty. We think the court did right in refusing this instruction. It did not include all the elements to be considered in determining whether or not the deceased was properly at this place, and even if he did not perform the duty in the particular manner that the defendant would desire him to, he was actually in the performance of the duty, and even if negligently performed, could only be contributory negligence, which is no defense.

It is also insisted by counsel for plaintiff that there is no proof of actual pecuniary damages to the defendants and that they were not entitled to recover more

than nominal damages. It is said that the deceased did not in any manner contribute to the support of either of his parents and that he was allowed to care for himself and lived with his grandfather, or wherever he could secure a livelihood. While it is true that the record does not disclose that he ever contributed any great amount, yet the uncle of the boy states that he did contribute to their support, but it is insisted that actual dependence for support in some substantial measure at least upon the decedent is necessary to a recovery. It is true that it appears from the evidence that the parents were separated, the mother had remarried and that the boy lived a part of the time with his grandfather and a part of the time worked with his father, and that a part of the time the boy lived with his mother, but with all that this did not change the relation that the boy sustained to the defendants. He was their son and they were lineal heirs. It is said by our Supreme Court in the case of *Willis Coal & Mining Co. v. Grizzell*, 198 Ill. 317, which was a case where a father was suing for loss by reason of the death of a son: "The deceased left no child, children, descendants of children or adopted child or children, and no mother. Benton Grizzell, the father, was the only 'lineal heir' of said Thomas Lee Grizzell, the deceased, hence the right of action rested in the appellee Benton Grizzell alone." The defendants being lineal heirs of the deceased, we think that it is well settled by our courts that upon proof of the death, by reason of the negligence of the plaintiff, the law presumes pecuniary loss and substantial damages to such lineal heirs, and that an entirely different rule prevails where the next of kin are lineal and where they are collateral. If collateral, they must prove that they were in the habit of receiving pecuniary assistance from the deceased or they could only recover nominal damages. "If they were lineal, the law presumes pecu-

niary loss from the fact of the death." *Dukeman v. Cleveland, C., C. & St. L. Ry. Co.,* 237 Ill. 109, citing *City of Chicago v. Scholten,* 75 Ill. 468, and *Chicago & N. W. R. Co. v. Swett,* 45 Ill. 197.

We have examined the authorities cited by counsel for plaintiff upon this subject, and while in the case of *Fowler v. Chicago & E. I. R. Co.,* 234 Ill. 625, the court condemned the instruction given, but in passing upon that instruction they say that the question of damages is exceedingly difficult of admeasurement and must therefore be left largely to the judgment of the jury, and state a number of things that may be proven in connection with the life and habits of the deceased, and conclude by saying: "And to prove whether he was of good habits, so that the jury could determine whether or not he would probably make proper use of such ability and money-earning capacity as he might possess. These and other matters of like character may be shown and are proper for the consideration of the jury, and the jury should upon such evidence, together with all the other evidence in the case, fix the damages, if any, at a sum equal to the actual pecuniary loss sustained by the next of kin." In this connection counsel criticise the action of the court in giving the defendant's fifth instruction upon the question of damages and refusing plaintiff's fifth instruction upon the same question. The refused instruction by its terms limited the amount of recovery to nominal damages, and the defendant's fifth given instruction would by its terms permit substantial damages, as they should determine from all of the circumstances that he would have been able to and would probably have given to the plaintiffs so far as appears from the evidence. We believe that the court did not err in refusing the fifth instruction offered by plaintiff, and that the instruction as given for the defendants was substantially correct.

Lastly, it is insisted by counsel that the giving of the first instruction on behalf of the defendants was the most serious error committed by the court, in that i' did not require the plaintiff to prove that a dangerous condition existed, at the place complained of, by a preponderance of the evidence in the case, and that it allowed ''A jury full sway to find a verdict by any kind of evidence under an instruction of this kind.'' It is true that the word ''preponderance'' is not used in this instruction, but it does require the jury to believe ''From the evidence that there existed a dangerous condition,'' but we think the jury were well advised that the defendants were required to prove their case by a preponderance of the evidence by plaintiff's second, sixth and eighth instructions. By the sixth of these instructions the jury were told that ''The burden of proof is upon the plaintiffs to prove the exact violation of the statute in manner and form as charged in the declaration.'' These instructions must be considered as a series, and the question of the burden of proof and preponderance of evidence was so often stated that we feel quite confident the jury could not have been misled about their duty in this respect.

It is also true that there was no dispute as to the facts in this case upon the question of the conditions that existed in the mine, so that plaintiffs have no right to complain in this regard. If the deceased was capable of earning $2.56 per day and was only eighteen years of age, we are not able to say that the verdict of this jury was unreasonable in allowing these parents $1,000.

We find no substantial error in the verdict of the jury, instructions, or order of the court in overruling the motion for a new trial, and the judgment of the lower court is affirmed.

*Judgment affirmed.*